IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MIA A. BIRD, : | |
|             Plaintiff  : | CIVIL ACTION |
| : | No. 21-cv-747 |
| v.  : | |
| : | |
| MASTERY CHARTER SCHOOLS, : | |
|             Defendant  : | |

## MEMORANDUM OPINION

**Goldberg, J.**                                                                                                        June 10, 2024

       Defendant Mastery Charter Schools ("Mastery") has filed a motion seeking summary judgment on Plaintiff Mia Bird's remaining claim for race discrimination. Because the evidentiary record supports Mastery's contentions that it was not Bird's employer and did not discriminate against her, the motion shall be granted and judgment entered as a matter of law in its favor.

**I.     PROCEDURAL HISTORY**

       Mia Bird ("Bird") is an African American woman who began working for Nutrition, Inc., d/b/a "The Nutrition Group" or "TNG" in August 2013 as a Food Service Director. (Statement of Undisp. Mat. Facts ¶ 1, ECF No. 69).[1] Mastery is a public school formed under the Pennsylvania School Code and is headquartered in Philadelphia, PA. Mastery has over 500 employees and

---

[1] Hereafter the "Statement of Undisputed Material Facts" attached to and included as part of Defendant Mastery's motion for summary judgment shall be abbreviated as "SUMF," and the "Statement of Additional Facts" attached to Plaintiff Bird's response in opposition shall be cited as "SAMF."

1

operates some 25 charter elementary, middle, and high schools in the City of Philadelphia and the City of Camden, NJ. (Am. Compl. ¶ 9). TNG is a food service and facilities management business which has among its lines of business a "school division" through which it provides food services to schools in Pennsylvania, New Jersey, and several other states. (SUMF ¶ 17, ECF No. 70-2; Am. Compl. ¶s 10-11, 15, ECF No. 9). At the time of her hire, Bird was assigned to oversee food service delivery at what was then the Arts and Sciences Charter School in Northeast Philadelphia, and her supervisor was TNG Regional Manager Fletcher Vollmer, a white man. (SAMF ¶s 14, 15). The position of Food Service Director ("FSD") is an operational management position, whereas the Regional Manager ("RM") position is an upper management position. (SAMF ¶s 27-29, 33).

Beginning in the 2015-2016 school year, TNG began providing food services to several Mastery schools. (SAMF ¶ 19). Bird was promoted to the RM position on July 13, 2015. (SAMF ¶ 20). At the time of her promotion, Bird had been working as an FSD at several other schools in addition to her original assignment, including the Philadelphia Performing Arts Charter School ("PPACS") in Center City and Keystone Charter School in Northeast Philadelphia, overseeing a staff of some 7-12 people at each school. (Def.'s Ex. A, Dep. of Mia Bird Vol. I, 78-81, ECF No. 69-1). As an FSD, Bird was "stationary" at the locations of the schools to which she had been assigned, but following her promotion, Bird was assigned to more school accounts and began overseeing the FSDs in the Wissahickon, Lower Moreland and Pennsbury School Districts, as well as her schools in Philadelphia. (Bird Dep. Vol. I, 84-85). Bird also came under the direct supervision of Mary Filler, a white woman, who was then Vice President of the Pennsylvania Southeastern Region for TNG's School Division. (SUMF ¶ 4; SAMF ¶ 10).

At the start of the 2017-2018 school year, Bird became the TNG RM assigned to Mastery's account, which at that time consisted of ten separate schools. (SUMF ¶s 3, 5; SAMF ¶s 35-36). Concurrent with the Mastery account, Bird was also the assigned RM on the Franklintown Elementary and High School accounts in Philadelphia and Our Lady of Mt. Carmel School in New Jersey. (SUMF ¶ 6). Like all RMs, Bird maintained a home office from which she usually worked, although on those occasions when she needed to be at a particular school, she had access to and would use the FSD offices, which were usually located immediately adjacent to the school's cafeteria. (SUMF ¶ 7; SAMF ¶ 37; Bird Dep. Vol. I, 245-246; Def.'s Ex. B, Dep. of Mary Filler, 191, ECF No. 69-1).

At the outset of the 2018-2019 school year, Bird became the "Resident Regional Manager" ("RRM") for TNG's Mastery account, which by then had grown to encompass thirteen schools. (SUMF ¶ 46; SAMF ¶ 38). At the same time, Bird continued to be the RM assigned to her three other school accounts. (SAMF ¶ 38). The position title "Resident Regional Manager" arose from discussions between TNG and Mastery and has only been used on the Mastery account in TNG's Southeastern Region; Bird was the first person to hold the position. (SUMF ¶s 48; SAMF ¶s 40-42, 47). In addition to Mastery, TNG also has an RRM in place in the Okaloosa School District in Florida, and in the Beaufort School District in South Carolina. (Filler Dep., 41; Pl.'s Ex. 4, Dep. of Nancy Kohl, 73-74, 129, ECF No. 70-4). The position is effectively the same as the RM position, and is typically in place only on large accounts requiring the dedication of large amounts of time to service. (Kohl Dep., 126-128). Because of the size of the Mastery account and Mastery's specific requests for more day-to-day preparation and oversight, greater accountability requirements, and its expectation that its assigned RM would spend 80% of their time on servicing its schools, TNG determined that it would be a good business move to have a resident RM at

3

Mastery. (Filler Dep., 36-37; SAMF ¶s 50-51). While Mastery asked only that whoever was the RM assigned to its account be present on its campus more often, the actual decision to place a dedicated RRM in a specific office on a Mastery campus, was TNG's, albeit in collaboration with Mastery. (Filler Dep., 56-60, 152-154; Pl.'s Ex. D, Dep. of Christine Cornelius, 37; SUMF ¶s 44, 48). Mastery did not ask that Bird specifically be its assigned RRM but once the decision was made that she would be the one to fill that role, Mastery allowed her to choose which campus office from which to work. (Filler Dep. 153-154; Cornelius Dep. 43-44).

In her role as both RM and RRM, Bird was required to have knowledge of food costs, Profit and Loss Statements and inventory management. (Pl.'s Ex. 15, Remote Dep. of Mia Bird in Workers' Compensation Action No. 85445598, 5-6). Bird was responsible for drafting and creating budgets, managing food contracts at all her assigned schools as well as communications between TNG, business managers, school administrators and employees, completing weekly and monthly paperwork, and ensuring that the food service requirements of the federal and state Departments of Education and the National Breakfast and Lunch Program were met. (*Id*.). Additionally, in her role as Mastery's RRM, Bird was required to attend health inspections and monthly (and sometimes weekly) meetings with Christine Cornelius, Mastery's Food Service Operations Manager and Meagan Covino, Mastery's Assistant Director of Food Operations, inform Mastery when she wasn't working on its account, obtain Mastery's approval in employee hiring, training, discipline and pay raises, and perform point of sale, tally sheet, production, and kitchen observation audits. (Bird Dep. Vol. I, 200-205).

In October 2018, Bird complained to Mary Filler and Frances Spencer, the then-Network Director of Operations at Mastery, about what she believed was a racially discriminatory remark made by Meagan Covino, who was then Mastery's Assistant Director of Food Operations, to FSD

Carina Jones. (Bird Dep. Vol. I, 38). In response to Bird's inquiry into an outstanding work order, Jones explained that because she had been having difficulty getting the building engineer to respond to the order, she spoke with Covino who told her she (Covino) "knew how to get what she wanted from white men" so she "would take care of it" (*Id*. at 39). Carina Jones is black, and Covino is Caucasian. (SAMF ¶s 7, 8 92; Bird Dep. Vol. I, 39-41). Bird was not present when Covino made the statement and only learned of this remark afterward from Jones. Although Jones told Bird she didn't want to talk about it and didn't want an apology, Bird wanted Spencer and Filler to "resolve" the matter. (Bird Dep. Vol. I, 40-42). Bird, however, does not know whether Spencer or anyone else spoke to Covino about the reported comment or otherwise addressed it, and Covino never discussed the matter with Bird. (*Id*.).

In addition to Covino's comment, Bird also believed Cornelius and John Buttil, Mastery's Network Director of Operations, had made racially discriminatory remarks to, and discriminatorily treated her and other, hourly employees, directors, and students. (Bird Dep. Vol. I, 185). Although Bird complained and reported these discriminatory incidents and remarks to Filler, Spencer, and Buttil beginning in 2018, no actions were ever taken. (Bird Dep. Vol. I, 187). In February 2020, Bird filed complaints against Mastery with the Equal Employment Opportunity Commission (EEOC) concerning discrimination, and with the United States Department of Agriculture (USDA) about what she perceived to be improprieties in Mastery's distribution of food to the students in its schools and to those in the surrounding communities during the COVID-19 pandemic. (SAMF ¶ 100; Filler Dep. 144-145; Pl.'s Ex. 13, Dep. of John Buttil, 49-52, ECF No. 70-13). Following that, Buttil, who learned of Bird's filings from Filler, directed Cornelius and Covino to refrain from speaking directly to Bird without having someone else present, and he made Filler aware of his instruction. (SAMF ¶ 101; Buttil Dep., 52-54; Filler Dep., 145; Cornelius Dep. 124-125).

Buttil gave this directive to ensure that he was the only point of contact with Bird going forward. (Buttil Dep., 53; Cornelius Dep. 125).

At the conclusion of the 2019-2020 school year, on June 26, 2020, Nancy Kohl, the President of TNG's School Division, informed Bird that TNG was removing her from the Mastery account. (SUMF ¶ 75; Bird Dep., 192-193, 269; Filler Dep., 166). Bird remained assigned to the two Franklintown and Our Lady of Mt. Carmel accounts and in place of Mastery, was re-assigned to the Arts & Sciences, PPACS and School Lane accounts. (SUMF ¶ 79; Bird Dep. Vol. I, 270-271). Although the size of bonuses which TNG awards to its RMs can vary based on their job performance and the financial performance of their school districts/accounts, there was no change in Bird's base rate of pay as a result of the realignment of her assigned accounts. (SUMF ¶ 81; SAMF ¶ 84; Kohl Dep., 294-301).

On August 4, 2020, Bird dual-filed a charge of discrimination with the EEOC and the Pennsylvania Human Relations Commission ("PHRC") against Mastery alleging continuing race, color and gender discrimination and retaliation offenses. (Am. Compl. ¶4). Then, on September 11, 2020, Bird injured her neck and back while carrying totes up the stairs at Our Lady of Mt. Carmel. (SUMF ¶s 82-83; Bird Dep. Vol. I, 14-16). As a result of those injuries, Bird was unable to work,[2] and TNG terminated her employment that same day. (*See* Pl.'s Compl. and Def.'s Ans. ¶ 77 in *Bird v. Nutrition Group, Inc.*, Civ. A. No. 21-3239). On December 18, 2020, Bird received a Dismissal and Notice of Right to Sue from the EEOC, and she timely filed this action on February 18, 2021. (Am. Compl. ¶ 5). On June 1, 2022, I issued a Memorandum Opinion granting Mastery's Motion to Dismiss the Amended Complaint in part and dismissing Bird's claims for

---

[2] Because Bird has remained unable to work as a result of her injuries, September 11, 2020 was thus the last date on which she worked at all. (Bird Dep. Vol I, 14-17).

hostile work environment, gender discrimination, and retaliation against Mastery with prejudice, but denying the motion as to Bird's claim for race discrimination, which is the subject of the motion now before me.  (*See* ECF Nos. 34 and 35).  On May 10, 2023, Bird sought reconsideration of the dismissal of her retaliation claims against Mastery, which was denied on November 29, 2023.  (ECF No. 75).  The instant motion for summary judgment, filed on June 9, 2023, is now fully briefed and ripe for adjudication.

## II.     LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(a), a party may move for summary judgment as to any claim or defense, and "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*  "As to materiality, … [o]nly disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment…; [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "A genuine dispute exits 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Stone v. Troy Constr., LLC,* 935 F.3d 141, 148 n. 6 (3d Cir. 2019) (quoting *Anderson*, 477 U.S. at 248 (1986)).

A "judge's function" in evaluating a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (*per curiam)*.  "A party will not be able to withstand a motion for summary judgment merely by making allegations." *In re Tribune Media Co.*, 902 F.3d 384, 392-393 (3d Cir. 2018) (quoting *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002)).  "Instead, the nonmoving party

must 'designate specific facts' in the record to 'show that there is a genuine issue for trial.'" *Id*. (quoting *Celotex v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). In other words, "[t]he moving party is entitled to judgment as a matter of law when the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (citation omitted).

## III. DISCUSSION

Only one claim remains pending in this matter – for race discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 20000e, *et. seq*. and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et. seq*. Mastery argues it is entitled to the entry of judgment in its favor because Bird cannot show: (1) Mastery was her employer, (2) she suffered an adverse employment action as a result of being transferred from Mastery's account, and (3) that Mastery discriminated against her by subjecting her to treatment which differed from the treatment it afforded the RRM/RMs assigned to its account before and after her who were not members of a protected class, *i.e.*, who were Caucasian/white.

Title VII and the PHRA essentially "mirror" one another. In relevant part, Title VII provides:

> [i]t shall be an unlawful employment practice for an employer. . . to fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).

The PHRA similarly provides in pertinent part that it is unlawful:

[f]or any employer because of the race, color, . . . ancestry, [or] national origin of any individual . . . , to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required.

43 P.S. § 955(a).

Given the textual similarities and administrative prerequisites to filing suit (exhaustion of administrative remedies) common to both, the two statutes are interpreted and adjudicated under the same analytical framework. *See Qing Qin v. Vertex*, 2024 U.S. App. LEXIS 10686 at * 16 (3d Cir. May 2, 2024) (noting Plaintiff's Title VII, § 1981 and PHRA claims are examined "together because they fall under the same analytical framework."); *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n. 6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims."); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) ("[W]hile Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions . . . its courts nevertheless generally interpret the PHRA in accord with its federal counterparts."). Accordingly, Bird's Title VII and PHRA claims shall be considered concurrently, and the same analysis applied to both.

The threshold to any discrimination claim under either of the foregoing statutes is an employer-employee relationship. *Schwartzwelder v. Juniper Cmtys., LLC*, Civ. No. 2:23-0216, 2024 U.S. Dist. LEXIS 48023 at *5 (W.D. Pa. Mar. 19, 2024) (citing 42 U.S.C. §§ 2000e, 2000e-2; 43 P.S. §§ 954, 955). *See also Ariz. Governing Comm. For Tax Deferred Annuity & Deferred Comp. Plans v. Norris*, 463 U.S. 1073, 1086 (1983) ("Title VII primarily governs relations

between employees and their employer, not between employees and third parties.") Mastery asserts it had no such relationship with Bird and thus cannot be held liable.

Bird asserts she was an employee of *both* TNG and Mastery between 2018 and 2020. Indeed, the standard for determining whether a defendant is an employer for purposes of the anti-discrimination laws also embraces the concept of joint employment. *Bailey v. Millenium Grp.*, 2022 U.S. App. LEXIS 24422 at *3 - *4 (3d Cir. Aug. 30, 2022). Whether an employee is employed by one as well as another employer for these purposes turns on a number of factors, most particularly those outlined in the multi-factor test set forth in *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). *Id.*; *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013). Specifically, the Court in *Darden*, an ERISA action, looked to the traditional master-servant relationship as understood by the common law agency doctrine to evaluate "the hiring party's right to control the manner and means by which the product is accomplished." In so doing, it outlined the following "non-exhaustive list of relevant factors" for consideration:

> . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323-324 (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989)).

While courts generally focus "on which entity paid the [employee's] salary, hired and fired them, and had control over their daily employment activities," because there is "no shorthand formula or magic phrase that can be applied to find the answer, all of the incidents of the

relationship must be assessed and weighed with no one factor being decisive." *Faush v. Tuesday Morning, Inc.*, 808 F. 3d 208, 214 (3d Cir. 2015) (internal quotation marks and citations omitted). And "even when a legal standard requires the balancing of multiple factors . . . , summary judgment may still be appropriate even if not all of the factors favor one party, so long as the evidence so favors the movant that no reasonable juror could render a verdict against it." *Id*. at 215 (internal quotation marks and citations omitted).

Examining the record in this case under the *Darden* rubric, I find Bird has failed to establish she was a Mastery employee, notwithstanding her assertion that she was "hired" by Mastery when it "forced" her to take RRM status. For one, the evidence is clear that Bird was both hired and fired by TNG and there is simply no support for her contention that Mastery required her to be its RRM. Mastery required only that *whoever* was given RM responsibility over its account spend 80% of their time on the account, to be present on its campus(es) more often, and to have a dedicated office at one of its thirteen schools. While she may have had a heavier workload to service Mastery's account due to the large number of schools in its portfolio, it is clear Mastery did not require or choose Bird specifically to be its RM/RRM, nor did it require that there even be an RRM assigned to its account. (Filler Dep., 153-154). The position title was developed by TNG – not Mastery, and both the job title and the decision to create it for the Mastery account were business decisions made by TNG. Likewise, it is undisputed that it was TNG's decision to ask Bird to take the position, advising her that if she didn't take the job, "they would have to find someone else." (Bird Dep. Vol. I, 192-193, 248; Bird Dep. Vol. II, 172-173; Filler Dep., 36-37, 56-60, 152; Cornelius Dep., 37, 43-44; SUMF ¶s 44, 48; SAMF ¶s 50-51).

By Bird's own admission, she never applied for a job at Mastery – she applied to work for TNG, and it was TNG that hired her in August 2013 to fill a FSD position at the Arts & Sciences

11

Charter School in Northeast Philadelphia. (Bird Dep., 78-80). Bird was trained by TNG for this and her other succeeding positions,[3] she was paid by TNG,[4] and she was terminated by TNG several months after having been removed from the Mastery account and given other accounts in its place. (Bird Dep. Vol. I, 78-80, 118-119; Filler Dep., 161-162). It is further undisputed that Bird never received a job offer or job orientation from Mastery, and was never paid anything by or from Mastery, although she did receive a COVID bonus from TNG in 2020 at Mastery's urging. (Bird Dep. Vol. I, 100-104, 118-126). Her job performance evaluations also were prepared and reviewed by TNG alone. (Bird Dep. Vol. I, 278-279). No one at Mastery ever sought to have Bird removed from their account or asked that her employment be terminated. (Filler Dep., 162; Cornelius Dep., 116). At most, following Bird's EEOC and USDA complaints, John Buttil sought only to make himself the sole point of contact with Bird from that point onward and therefore directed Covino and Cornelius to refrain from having discussions with Bird alone. (Buttil Dep., 52-54; Filler Dep., 145; Cornelius Dep. 124-125).

Additionally, there was little difference in Bird's position when she became the dedicated RRM at Mastery from what she was already doing for Mastery as an RM. (Filler Dep., 165-166, 180-181). For one, a separate job description does not exist for the RRM position because TNG considers it to be the same job as an RM with the same job title, same salary, and same benefits. (Filler Dep., 60-62; Kohl Dep., 123-126, 151-152). There is a difference in the size of the accounts to which an RM/RRM is assigned: an RRM is assigned only to large districts/accounts with a lot

---

[3] Mastery did ask Bird to retrain the school cashiers on how to use a new button that had been added to the Point of Service registers and on how to capture and track additional, non-reimbursable meals. Thus, Bird did receive some training from Mastery supervisors on how to handle these matters so that she, in turn, could train the cashiers. (Bird Dep. Vol. I, 126-130).

[4] The RRM's salary was specifically included in the contract between TNG and Mastery; Bird's paychecks were paid to her by TNG. (Filler Dep., 160-161).

12

of needs and the expectation that much of the RRM's time will be spent taking care of those needs. (Kohl Dep., 152). Thus, as an RRM, Bird did assume additional responsibilities as a result of her assignment to Mastery's account, and she was given a dedicated office with a desk, phone, and locking file cabinet, although she was allowed to choose which office in which Mastery school to use. (Bird Dep. Vol. I, 245-248; Bird Dep. Vol. II, 229-230; Filler Dep. 153-154; Cornelius Dep. 43-44). Among these additional responsibilities were performing Point of Service audits, attending meetings with Cornelius and Covino, attending health inspections, and preparing in-depth monthly financial analyses, in which Bird was required to compile information on food sales, expenses, profits and losses as to each individual school/building, participation, enrollment, accountability, staffing and hourly employee needs. (Filler Dep., 155-156; Bird Dep. Vol. II, 232-233, 236, 246). Bird was also responsible for informing Mastery representatives when she was working on her other assigned accounts. (Bird Dep. Vol. I, 207-208).

Moreover, all the hourly employees working in the Mastery schools who Bird supervised were employees of TNG. (Filler Dep., 156). TNG, Bird, and Mastery all collaborated, and Mastery had input into hiring, transferring, disciplining, and promoting the TNG employees who worked in Mastery's schools. (Bird Dep. Vol. I, 135-137). TNG prepared the menus and budgets for its food service operations at Mastery's schools, with input from Bird and the FSDs assigned to each building and Mastery, which were subject to Mastery's approval under its contract with TNG. (Filler Dep. 156-158). And although the equipment and facilities in the Mastery school buildings was provided by and belonged to Mastery, TNG recommended what equipment was necessary and should be installed for it to perform its food service operations. (Filler Dep., 159-160).

While the evidence detailed above does reflect that while Mastery had some control over what work it required its assigned RM/RRM to perform, ultimately the functions of the position and the scope of the work expected to be performed by the individual who held that position, were matters determined by the agreement/contract which existed between Mastery and TNG.  This is not enough to overcome the weight of all the other evidence which shows that, throughout the duration of her assignment to the Mastery account, Bird was solely employed by TNG.[5]  I therefore find that Bird has no cause of action under either Title VII or the PHRA against Mastery and it is therefore entitled to the entry of summary judgment in its favor.

I also find the evidence fails to sustain Bird's claim that Mastery discriminated against her by treating her differently than other RM/RRM's not in her protected classification.  "A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *Qing Qin*, 2024 U.S. App. Lexis at * 20 (quoting *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990)).  "For a successful disparate treatment claim, proof of the employer's discriminatory motive is critical," and may be shown either through direct or circumstantial evidence. *Id*. (internal quotation marks and citation omitted).  "Direct evidence of disparate treatment is evidence that is so revealing of discriminatory animus that it is not necessary

---

[5] Again, Bird was hired, trained, primarily supervised, paid, promoted, re-assigned, and ultimately terminated, by TNG.  She received benefits and job performance evaluations from TNG.  Bird's employment relationship with TNG began before and ended after, her Mastery RRM assignment and she remained assigned to three other accounts while assigned to Mastery's.  Mastery, unlike TNG, is not in the food service business; its primary business is operating charter schools.  While Mastery required Bird to spend 80% of her time working on its account because of the extra functions which it expected to be performed pursuant to its contract with TNG, and had some input into which hourly employees were hired to work in its schools, those hourly employees were all ultimately hired, paid, promoted, disciplined and/or terminated by TNG and it is undisputed that those employees were solely employed by TNG.

14

to rely on any presumption from the prima facie case to shift the burden of production." *Qing Qin*, 2024 U.S. App. LEXIS at *20 (internal citation and quotation marks omitted). Because direct evidence of discrimination is often lacking, employment discrimination cases are frequently evaluated under the burden-shifting paradigm established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff in a Title VII action complaining of a discriminatory employment action bears the burden of initially making out a prima facie case of discrimination by showing: (1) s/he is a member of a protected class, (2) s/he was qualified for the position s/he sought to attain or retain, (3) s/he suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). Once the initial showing has been made, an inference of discriminatory motive arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id*. (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). If the defendant does so, the inference of discrimination drops and the burden returns to the plaintiff to show that the defendant's proffered reason is merely a pretext for intentional discrimination. *Id*.

Given that there is no direct evidence of discrimination on the record, it is incumbent upon Bird to first make the prima facie showing required under *McDonnell Douglas*. The first three elements have obviously been established as it is undisputed that Bird is an African American woman, was qualified for the job which she held for some three years, and suffered an adverse employment action by virtue of her termination on September 11, 2020.

However, as to the fourth element, which can be established by evidence of comparators who were treated more favorably than the plaintiff or through circumstantial evidence showing a causal link between membership in a protected class and the adverse employment action, Bird falls

15

short.  For one, to prevail under Title VII and the PHRA, Bird must show that Mastery was "a decisionmaker" which was "involved in" or "participated in" the "decision making process" to terminate her.  *See Barbee v. SEPTA*, Civ. No. 04-4063, 2006 U.S. Dist. LEXIS 50314 at *16 (E.D. Pa. July 24, 2006) (citing *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) and *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995)) (noting that "[d]ecisionmaker for the purposes of discrimination claims include individuals within 'the chain of decisionmakers who had the authority to hire and fire,'" and "a decisionmaker is an individual who is 'involved in' or 'participated in' the decision making process.").

Here the evidence is to the contrary.  The decision to reassign Bird from the Mastery account did not result from Buttil or Mastery requesting her removal but rather resulted from Filler's observations that Bird was "very agitated with the happenings at Mastery" during the COVID feeding program in 2020, had become difficult to manage, and Filler's belief that reassigning Bird to other accounts was in Bird's best interest.  (Butill Dep., 102-103; Filler Dep., 94-98, 162-163).  The decision to terminate Bird was made by Nancy Kohl and Ian O'Brien, who believed her performance and her refusal to share the details behind her complaints of discrimination warranted this action.  (Filler Dep., 114-115, 162-163; Kohl Dep., 192-193).  There is absolutely no evidence that Mastery played any role in the decisions to remove Bird or to terminate her employment altogether.  Hence summary judgment is properly entered in Mastery's favor for this reason as well.

Likewise, the evidence fails to show Bird was "singled out and treated less favorably than any others similarly situated" on the basis of her race or gender.  *Metal Service*, 892 F.2d at 347. As comparators, Bird points to Fletcher Vollmer, a white male and her former supervisor, and Melissa Lichtner, a white woman, who ultimately succeeded her as Mastery's RRM and asserts

they were not required to perform the same work that she did. The record shows, however, that Lightner provides the same services to Mastery as did Bird, and hence aside from the difference in their respective races, there is no evidence that she has been treated differently than Bird. (Filler Dep., 165-166). Moreover, Bird acknowledges she has no evidence or knowledge concerning who replaced her or whether Mastery played any role in selecting who that person would be. (Bird Dep. Vol. I, 249-250).

As to Vollmer, Bird's predecessor on the Mastery account in the 2016-2017 school year, Bird is correct that he was not designated as an RRM, but was rather an RM. Bird is also correct that Vollmer was not required to dedicate the same amount of time to the Mastery account or to maintain an office on a Mastery campus. (Cornelius Dep., 35-37). At that time, however, the Mastery account was not as large as it became when Bird was designated its RRM. When Bird first assumed responsibility for Mastery, she too was an RM overseeing the 10 schools in Mastery's portfolio, along with several other accounts; it was only when Mastery added another 3 schools to its account that Bird became its RRM. (SUMF ¶s 3, 5, 46; SAMF ¶s 35-36, 38). In the absence of any further or more compelling evidence, I cannot find that Vollmer was a true comparator for purposes of assessing whether Mastery treated him differently either. Accordingly, the entry of judgment as a matter of law is also merited on this basis.

For all of the foregoing reasons, I find that summary judgment is properly entered in favor of Mastery Charter Schools and against Mia Bird on her claim of race discrimination. An appropriate Order follows.